**GUY JAMES CONSTRUCTION COMPANY**

v.

**TRINITY INDUSTRIES, INC., and United States Fire Insurance Company.**

No. CA 3–74–777–C.

United States District Court,
N. D. Texas,
Dallas Division.

Dec. 7, 1978.

---

William Andress, Jr., Dallas, Tex., Watts, Looney, Nichols, Johnson & Hayes, Oklahoma City, Okl., Meer, Wolf & Slatkin, Denver, Colo., for plaintiff.

John L. Estes, Andrew Barr, J. J. French, Jr., Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM M. TAYLOR, Jr., District Judge.

This cause came on for hearing before the Court, sitting without a jury, on October 3, 1977. Upon consideration of the pleadings, the evidence, the argument and briefs from counsel, the Court makes the following findings of fact and conclusions of law, in accordance with the provisions of Rule 52, Federal Rules of Civil Procedure.

### FINDINGS OF FACT

#### I.

### JURISDICTIONAL AND BACKGROUND FACTS

1. Plaintiff Guy H. James Construction Company (hereinafter referred to as "James") is a corporation created under the laws of the State of Oklahoma and its principal place of business is located in Oklahoma City, Oklahoma. Defendant Trinity Industries, Inc. (hereinafter referred to as "Trinity") is a corporation created under the laws of the State of Texas and its principal place of business is located in Dallas, Texas. Defendant United States Fire Insurance Company (hereinafter referred to

as "Surety") is a corporation organized under the laws of the State of New Jersey and its principal place of business is located in Morris County, New Jersey.

2. On August 3, 1971, the Dallas/Fort Worth Regional Airport Board (hereinafter referred to as "D/FW"), as owner, and James, as general contractor, entered into a contract for the construction of four bridges to be used by airplanes in crossing from one side to the other side of the new Dallas/Fort Worth Airport. The contract itself consisted of a "Contract Agreement," a volume containing written specifications and a set of plans or blueprints. (Hereinafter these three documents are at times collectively referred to as "the construction contract.")

3. Upon completion, two of the bridges formed a part of taxiway 19 which runs east and west immediately north of the terminal area and connects the runways, terminals and other facilities on the east and west sides of the airport with one another. The other two bridges formed a part of taxiway 31 which connects the two sides of the airport immediately south of the terminal area. The two bridges on each taxiway are approximately 205 feet apart. The bridge on the west end of taxiway 19 was identified as "bridge 19W" and the bridge on the east end of taxiway 19 as "bridge 19E." The bridge on the west end of taxiway 31 was identified as "bridge 31W" and the bridge on the east end as "bridge 31E."

4. The configuration of each of the four bridges is substantially the same. The concrete deck of each bridge measures approximately 273 feet by 104 feet and is approximately 16½ inches thick. Each deck is supported by six rows of steel girders which run the length of the bridge. Each row of girders consists of four separate girders, two of which are approximately 49 feet long and two of which are approximately 87½ feet long.

5. The girders essentially have a bottom and two sides which slope upward and outward. They are open at the top. The bottom of each girder is a flat piece of steel which varies from $5/16$ to $11/16$ of an inch in thickness, which is approximately 4 feet 7 inches wide and which is either 49 feet or 87½ feet long, depending on the length of the particular girder. This piece is called the "bottom flange." Each side is a flat piece of steel which varies from $3/8$ to $7/16$ of an inch in thickness, which is approximately 54 inches high and which is as long as the particular girder. Each of these pieces is called a "web." The girder is formed by welding the bottom edge of one web to one edge of the bottom flange and the bottom edge of the other web to the other edge of the bottom flange. The webs are welded to the bottom flange in such a manner that they slant upward and outward from the bottom flange at an angle which is approximately 30 degrees from vertical. At the bottom of a girder the webs are approximately 4 feet 6 inches apart and at the top they are approximately 9 feet apart. After the bottom flange and the webs have been welded together, the cross section of a girder could be described as the bottom half of a hexagon. Although the basic configuration of the girders remains the same, a piece called the "top flange" is welded to the top of each web. This flange is a flat piece of steel from ½ to one inch thick, from one foot to 18 inches wide and as long as a particular girder. It is attached to the girder so that it is horizontal and so that it is centered along the top edge of the respective webs with one-half extending out from the center of the girder and the other half extending toward the center of the girder.

6. When the girders were erected on the abutments, columns and pier caps, each row of girders was separated from the adjacent, parallel girder row by a distance of nine feet. In order to pour the concrete decks, forms were placed in the spaces between the rows of girders. Also, lightweight metal stay-in-place forms were placed over the open, top side of the girders so that the girders would not be filled with concrete.

7. In order to protect vehicles passing under a bridge from the exhaust blast of jet engines on airplanes crossing over a bridge, the plans called for "blast protection" to be

erected on both sides of each bridge. The blast protection, as originally contracted for, was a network of steel girders and plates which, like the bridge girders, rested upon abutments, columns and pier caps, which extended the 273 feet length of a bridge and which extended out from each side of a bridge approximately 52½ feet.

8. James planned the project so that during most of the construction it would be working on all four bridges at the same time. However, it planned to perform each construction task or activity successively on each of the four bridges in the following order: 19W, 19E, 31W and 31E. Thus, bridge 19W would be the first bridge started and the first finished and bridge 31E would be the last started and the last finished.

9. The construction contract between D/FW and James provided that an engineer would be D/FW's representative for supervising, monitoring, coordinating and inspecting the construction of the work and that communications from the contractor to D/FW would be through the engineer. The firm which had designed the taxiway bridges was designated as such engineer. This firm was a joint venture between the Fort Worth engineering firm of Carter & Burgess, Inc., and the Dallas engineering firm of Forrest and Cotton, Inc. This joint venture was named "Consultant Engineers."

10. In addition to Consultant Engineers, D/FW retained the New York City engineering firm of Tippetts-Abbett-McCarthy-Stratton (hereinafter referred to as "TAMS"). This firm supervised Consultant Engineers' work in connection with the taxiway bridges and, in addition, had supervisory responsibility for other facilities at the airport.

11. The construction contract required that James employ an independent testing laboratory to inspect the fabrication of the bridge girders and pier caps and to certify that they were being properly fabricated in accordance with the plans and specifications. To perform these tasks James employed the Dallas office of Southwestern Laboratories, Inc.

12. In July, 1971, Trinity presented to James two written offers to sell the steel girders, pier caps, shoes, armor joints and bearings required for the four bridges. These offers were identical except for a time/price differential. One offer proposed a six weeks earlier delivery date and ½ cent per pound higher price. Based upon the quantity of steel ultimately delivered, the difference between the offers amounts to $17,129.65.

13. In August, 1971, James issued an unsigned purchase order specifying the earlier delivery date and higher price. On September 24, 1971, Trinity signed the purchase order and returned it to James with a letter which stated Trinity considered itself ". . . to be a materials supplier in accordance with the terms of our proposal and your purchase order." Further, the letter requested that James sign and return a copy of the purchase order. Subsequently this was done by James.

14. Delivery under the contract was required to commence not later than January, 1972, and be completed not later than June 15, 1972.

15. All parties recognized that time was of the essence of the contract, all parties shared the common knowledge of the area that the completion of the Dallas/Fort Worth Regional Airport was a matter of high priority and great time pressure, and that the contract between James and D/FW provided for liquidated damages of $1500.00 per day, not in the usual manner of an option to be exercised by the owner, but as an absolute obligation to pay by James, as provided in the D/FW-James contract.

16. On February 7, 1972, James and Trinity, through the issuance and acceptance of another purchase order, contracted for Trinity to fabricate the blast protection for the four bridges.

17. During January, 1972, Trinity delivered to the airport job site various items called for by the bridge girder contract and on March 13, 1972, it began to deliver the girders for the first bridge, bridge 19W.

18. Shortly after these girders were delivered, inspection of the girders by James, Consultant Engineers, and others revealed that the girders were not in accordance with the plans and specifications. Upon the order of Consultant Engineers issued to James on April 26, 1972, and, in turn, transmitted by James to Trinity, the girders for bridge 19W were removed from the airport and returned to Trinity's plant.

19. On June 2, 1972, Consultant Engineers rejected all of the girders for all four bridges. At a meeting on June 12, 1972, attended by representatives of D/FW, TAMS, Consultant Engineers, James and Trinity, the decision to reject the girders was affirmed by D/FW.

20. Thereafter, Trinity subcontracted with Mosher Steel Company and the American Bridge Division of United States Steel Corporation for new girders to be fabricated for all four bridges.

21. In response to the request of Trinity and James, D/FW agreed to a revised blast protection design which permitted the rejected bridge girders to be modified and used in lieu of the blast protection Trinity had previously contracted to furnish.

22. Because a dispute existed between James and Trinity as to Trinity's performance, James in February, 1973, withheld from Trinity payment of $300,299.11 for certain items which had been fabricated and delivered to James. Thereafter, Trinity and James entered into an agreement whereby James paid such sum to Trinity, James agreed to promptly pay for all items delivered thereafter, and Trinity furnished a $500,000.00 bond to James which was made by Surety. This bond provided, in pertinent part, that in the event Trinity failed to pay a final judgment rendered in favor of James, Surety would pay a sum of up to $500,000.00 in satisfaction of the judgment.

23. Delivery of the girders fabricated by Mosher Steel and American Bridge commenced on December 19, 1972. These new girders were erected by James and incorporated into the bridges. The rejected girders were modified by Trinity, delivered to the job site and erected by James as the blast protection.

24. Bridges 19W and 19E were accepted for beneficial occupancy by D/FW on September 20, 1973, and bridges 31E and 31W were accepted for beneficial occupancy on November 4, 1973. In order to complete the work called for by the bridge construction contract James continued to work on and about the bridges until approximately May, 1974.

25. Trinity's failure to provide the steel in a timely manner and in accordance with the contract (Findings of Fact Numbers 18 and 19) constituted a breach of the Trinity/James Contract.

26. James' job completion delay was caused by the delay of Trinity in delivery of steel in accordance with contract specifications.

27. On August 14, 1974, James brought this suit against D/FW, Trinity, Surety, Southwestern Laboratories, Inc., and Howard-Chamblee-McAfee, a joint venture which entered into a subcontract with James to perform the electrical and lighting work on the bridges (hereinafter referred to as "Howard Electric").

28. On April 22, 1975, James filed its first amended complaint and brought into this suit as additional defendants TAMS, Forrest and Cotton, Inc. and Carter and Burgess, Inc.

29. Howard Electric and James reached a settlement and an order of dismissal with prejudice has been entered.

30. On April 6, 1976, D/FW and James entered into a settlement agreement which provided that from the $497,162.43 which D/FW had withheld from payment to James at the conclusion of work, D/FW would deduct and retain $102,162.43 as its damages and would pay to James the remaining $395,000.00 in settlement of claims asserted by James. The claims against D/FW have been dismissed with prejudice.

31. In April, 1976, Consultant Engineers (Forrest and Cotton, Inc. and Carter & Burgess, Inc.) entered into a settlement agree-

ment and paid James a total of $10,000. Also in April, 1976, Southwestern Laboratories, Inc. negotiated a separate settlement agreement and paid James $9,000. In June, 1976, TAMS settled with James and paid $10,000. The claims against each of these defendants have been dismissed with prejudice.

32. On July 10, 1976, James filed a second amended complaint against the two remaining defendants, Trinity and Surety. This case was tried upon this second amended complaint. The claims asserted therein by James are as follows:

| | |
|---|---|
| Liquidated damages | $453,000.00 |
| Job site overhead | 30,192.22 |
| Home office overhead | 187,390.00 |
| ½ cent per pound difference between Trinity offers | 17,129.65 |
| Blast protection welding | 30,880.00 |
| | $718,591.95 |

## II.

## JAMES' CLAIM FOR LIQUIDATED DAMAGES

### A. *Background Facts and Contentions of Parties*

33. After James concluded work on the bridge project, D/FW withheld payment on the following matters in the amounts indicated:

| | |
|---|---|
| Liquidated damages | $453,000.00 |
| Sandblast cleaning | 52,728.04 |
| Amount retained to keep Construction Contract open for negotiations | 1,403.72 |

34. The construction contract specified November 15, 1972, as the completion date for the four bridges and provided for liquidated damages of $1,500.00 per day for failure to complete by that date. In response to a request by James, the completion date was extended to December 14, 1972, as a result of unusually severe weather conditions. The $453,000.00 sum listed above in paragraph 33 was calculated by assessing damages of $1,500.00 per day for the 279 day period between December 14, 1972, and the acceptance of bridges 19W and 19E for beneficial occupancy on September 20, 1973, and by assessing damages of $750.00 per day for the 46 day period between September 20, 1973, and the acceptance of bridges 31W and 31E for beneficial occupancy on November 4, 1973.

35. The construction contract required that, after erection, all structural steel be sandblast cleaned. The $52,728.04 sum listed above was withheld because a uniform texture and color had not been achieved as required by the contract.

36. The $1,403.72 sum listed above was retained by D/FW to keep the construction contract open for negotiations concerning the disputes which had arisen under the contract.

### B. *Analysis of Settlement Agreement*

37. The total amount paid by James to D/FW for D/FW's damages was, as stated in the settlement agreement, $102,162.43. In substance, the settlement agreement provided:

| | |
|---|---|
| $4,703,401.07 | contract amount to be paid by D/FW to James for construction of bridges (after adjustments in supplemental agreements) |
| less: 4,206,238.64 | amount paid by D/FW to James during course of construction |
| 497,162.43 | amount retained by D/FW upon completion of construction |
| less: 395,000.00 | amount from retainage paid by D/FW in settlement of various claims asserted by James, including its claim for liquidated damages |
| $ 102,162.43 | amount permanently deducted and retained by D/FW; that is, the amount "paid" by James to D/FW for D/FW's damages |

38. James is entitled to recover from Trinity the reasonable expenditures made in good faith by it as a consequence of Trinity's breach of its contract with James. Such recoverable expenditures would include a reasonable amount *actually paid* in good faith by James as liquidated damages.

39. Based on the settlement agreement between D/FW and James stating that ". . . [the] Board will permanently deduct and retain the amount of $102,162.43, representing Board's damages," the $102,-162.43 deducted and retained as a result of the settlement between D/FW and James was attributable in its entirety to liquidated damages caused by delay in job completion.

■ 40. James' claim to D/FW for the $1,403.72 withheld by D/FW "to keep the contract open" was well founded, as D/FW had no right to permanently retain such sum and James would have recovered such sum from D/FW if the claim had been adjudicated in a trial with D/FW. Thus, James has established that the $1,403.72 should not be deemed as having been permanently withheld by D/FW and none of the $102,162.43 paid to D/FW should be allocated to compensating D/FW for "keeping the contract open for negotiations." Thus, the $1,403.72 is included in the $395,-000.00 release payment to James.

41. Based on the settlement agreement statement that the $395,000.00 was paid ". . . as full and final payment of all claims under Contract C–048–71, and in settlement of the following claims between the Parties thereunder, to wit:

. . . Sandblasting Assessment,"

the settlement of the sandblasting claim is included in the $395,000.00 settlement amount paid to James.

42. The Court finds that payment by James of $102,162.43 in liquidated damages was reasonable and in good faith.

## III.

### HOME OFFICE OVERHEAD CLAIM

43. James seeks to recover from Trinity the amount of $187,390 as home office overhead expense incurred as a consequence of Trinity's failure to timely deliver girders which complied with specifications.

44. In order for James to recover from Trinity any sum for home office overhead expense, it must establish that, as a result of the delay, it incurred home office overhead expense in addition to that which it would have incurred if there had been no delay.

45. James, in fact, established that it incurred home office overhead expense in addition to that which it would have incurred if there had been no delay.

■ 46. James is entitled to recover that portion of its home office overhead expense which is reasonably allocable to the taxiway bridge project for the additional time it took James to complete the project because of the delay in receiving girders which met specifications.

47. The actual revenue generated by this contract in 1972 was $1,622,469.00.

48. The actual total revenue by James in 1972 was $22,752,154.00.

49. The actual home office overhead of James in 1972 was $547,000.00. The job equipment depreciation figure is not included in the home office overhead, since job equipment depreciation is not an administrative expense.

50. Based on Findings of Fact Numbers 47, 48 and 49, the total overhead allocation to this contract in 1972 was $38,000.00 and was incurred at a daily rate of $106.00 per day.

51. Utilizing this overhead rate ($106.00 per day), the resulting home office overhead for 325 days of delay is $34,450.00.

## IV.

### BLAST PROTECTION WELDING CLAIM—ACCORD AND SATISFACTION

52. Trinity has established by a preponderance of the evidence that in July, 1973, Trinity and James discussed the nature and amount of James' charges for additional blast protection welding, that they agreed that the charges set forth in James' invoice number 76 represented all additional charges for blast protection welding, and Trinity agreed to pay such charges. In January, 1974, these charges were paid by James deducting the amount thereof from

its final payment to Trinity. At that time James intended that all cost for additional welding be settled by James deducting the charges from the final payment.

■ 53. James' claim for alleged additional expense incurred in welding the blast protection is barred by the defense of accord and satisfaction.

## V.

### FIELD OFFICE OVERHEAD—JAMES ENTITLED TO RECOVER 19% OF FIELD OFFICE OVERHEAD EXPENSE

54. James seeks to recover from Trinity the amount of $30,192.22 as field office overhead expense incurred from May 7, 1972, to December 19, 1972, as a consequence of Trinity's failure to timely deliver girders which complied with specifications.

■ 55. James is entitled to recover that portion of its field office overhead expense which is reasonably allocable to the taxiway bridge project for additional time it took James to complete the project because of the delay in receiving girders which met specifications.

56. James has proven by a preponderance of the evidence that James incurred field office overhead expense for all of James' projects at the airport from May 7, 1972, to December 19, 1972, in the amount of $60,384.44.

57. James has proven by a preponderance of the evidence that 19 percent of $60,384.44, or the amount of $11,500.00, is reasonably allocable to the taxiway bridge project for field office overhead expense for the period of time from May 7, 1972, to December 19, 1972.

58. Thus, the Court finds that James is entitled to recover $11,500.00 from Trinity on its claim for field office overhead.

## VI.

### ½ CENT PER POUND DIFFERENTIAL BETWEEN TWO TRINITY OFFERS

■ 59. James asserts that the two offers submitted by Trinity "fixed the differ-ence in the value of steel not delivered by 15 June 1972, at ½ cent per pound." Based upon the quantity of steel ultimately delivered, the difference between the two offers amounts to $17,192.65.

60. James' damages cannot be measured by the time/price differential between two offers presented to James by Trinity, one of which was the basis for the contract ultimately entered into and the other of which was rejected by James. James' damages must be measured by reference to any damages incurred as a consequence of Trinity's failure to timely deliver girders pursuant to the contract between James and Trinity.

61. Thus, the Court finds that James is not entitled to recover any sum of money on its claim for the time/price differential between Trinity's two offers.

## VII.

### CLAIM AGAINST SURETY

■ 62. The agreement between James, Trinity and Surety provides, in pertinent part, that in the event Trinity fails to pay a final judgment rendered in favor of James, Surety will pay a sum of up to $500,000 in satisfaction of the judgment.

63. No final judgment has heretofore been rendered against Trinity and thus Trinity has not failed to pay any final judgment. These matters are conditions precedent to Surety's obligation to James. They have not occurred and thus Surety is not obligated to James.

64. Thus, the Court finds that James is not entitled to recover any amount of money from Surety.

### CONCLUSIONS OF LAW

1. This Court concludes that $102,000.00 in liquidated damages was the amount actually paid by James to D/FW because of Trinity's breach and James has been damaged by Trinity's breach in this amount. Further, Trinity knew at the time of contracting with James that James would incur

liquidated damages if Trinity was to cause James to be in breach with D/FW. Such amount of $102,000.00 is reasonable.

2. This Court concludes that the method of calculating home office overhead expense is reasonable and that $34,450.00 is a reasonable amount for additional home office overhead incurred by James as a result of Trinity's breach.

3. This Court concludes that James' claim for alleged additional expense incurred in welding the blast protection is barred by the defense of accord and satisfaction.

4. This Court concludes that James is entitled to recover $11,500.00 from Trinity on its claim for field office overhead. Such amount of $11,500.00 is reasonable.

5. The Court concludes that James is not entitled to recover any sum of money on its claim for the time/price differential between Trinity's two offers.

6. The Court concludes that James is not entitled to recover any amount of money from Surety.

7. This Court concludes that James is entitled to judgment against Trinity in the amount of $146,112.43 with interest on $102,000.00 liquidated damages at the rate of 6% per annum from 15 March 1974, the date of its withholding on the final estimate.